## HATTIESBURG LUMBER CO. v. HERRICK.

(Circuit Court of Appeals, Fifth Circuit. February 10, 1914. On Application for Rehearing, March 24, 1914.)

### No. 2342.

1. ACCOUNT (§ 6*)—GROUNDS OF JURISDICTION—ACCOUNTING.

A federal court of equity has jurisdiction of a suit which involves an accounting of complicated transactions between the parties extending over several years, with charges and countercharges, although relief of a legal nature is also sought by the bill.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 17, 18; Dec. Dig. § 6.*]

2. APPEAL AND ERROR (§ 185*)—JURISDICTION—WAIVER OF OBJECTIONS.

Where there was ground for contention as to whether a bill presented a case of equitable cognizance, and the defendant answered, consented

---

to a reference to a master, excepted to his report, and took a cross-appeal, he cannot, for the first time, raise the question of equitable jurisdiction in the appellate court by a motion to dismiss the appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1166–1176, 1375; Dec. Dig. § 185.*]

3. EQUITY (§§ 409, 410*)—REPORT OF MASTER—FINDINGS UNDER CONSENT ORDER.

Where by consent of the parties an order was entered appointing a special master with power to hear and consider all testimony whether taken by himself or by deposition, to view all physical evidence offered, to inspect the premises involved in the suit, and to report all testimony with exhibits, together with his findings of fact and conclusions of law, his findings of fact were conclusive upon the court, unless unsupported by any legal evidence, or contrary to all the evidence, and his conclusions of law, based upon the facts so found, only were reviewable on exceptions.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 904–923; Dec. Dig. §§ 409, 410.*]

4. EQUITY (§ 410*)—REPORT OF MASTER—EXCEPTIONS.

Exceptions to the report of a master which present questions of law only are not a waiver of the conclusive effect of his findings of fact.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 905–919; Dec. Dig. § 410.*]

5. LOGS AND LOGGING (§ 8*)—CONTRACTS—CONSTRUCTIONS—CUTTING AND SAWING TIMBER.

A contract by which complainant agreed to cut and saw timber owned by defendant, and then to either load the lumber on cars or stack it on the yard, depending on whether saw bills and shipping directions had been received from defendant, for which complainant was to receive a stipulated sum per thousand feet, was one for the performance of services, and if the title to the timber at any time passed to complainant, it was vested in defendant after it had been sawn into lumber and stacked on the yard, and complainant was not liable for its loss by fire after it was so stacked.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 15–17; Dec. Dig. § 8.*]

6. LOGS AND LOGGING (§ 8*)—CONTRACT—CONSTRUCTION—CUTTING AND SAWING TIMBER.

Under a provision of such contract that complainant should be paid monthly for the quantity sawed on a scale of the logs made by persons, selected by each party, but that final settlement should be made on the record of shipments of lumber kept by defendant, complainant could not be deprived of payment for lumber sawed by the action of defendant in cutting and trimming it before shipment, so as to increase its grade, but diminish its quantity.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 15–17; Dec. Dig. § 8.*]

7. DAMAGES (§ 40*)—BREACH OF CONTRACT—LOSS OF PROFITS.

The fact that a party has ceased performance of a contract because of its breach by the other party which justified the discontinuance of such performance does not deprive him of the right to recover as actual damages for the breach the profits he would have made by full performance, where the same can be shown with reasonable certainty, or, if not, his loss because of the outlay by him in preparing for performance.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 72–88; Dec. Dig. § 40.*]

Shelby, Circuit Judge, dissenting.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal and Cross-Appeal from the Circuit Court of the United States for the Southern District of Mississippi; Henry C. Niles, Judge.

Suit in equity by the Hattiesburg Lumber Company against Fred Herrick. From the decree, both parties appeal. Reversed on complainant's appeal, and affirmed on defendant's appeal.

This was a suit in equity filed by the appellant and cross-appellee against the appellee and cross-appellant in the chancery court of Harrison county, Miss., and removed therefrom by defendant to the Circuit Court of the United States for the proper division and district. The bill prayed for an attachment on certain lands of the defendant, who was a nonresident of Mississippi, pursuant to a state statute, and for a sale of said lands to answer the decree of the court for whatever amount, upon an accounting between plaintiff and defendant, was found to be due the plaintiff upon a contract between the parties, and also for damages for the alleged breach of the contract. The defendant answered the bill of complaint, and at the same time filed a cross-bill against the plaintiff, which was served upon it, and by which he claimed a decree for two certain items under the contract, aggregating $8,000, and for damages for the alleged breach of the contract sued upon by the plaintiff, to which the plaintiff interposed an answer. The case was then, by consent of the parties and by order of court, referred to a special master to take the testimony and report the same to the court at its next regular term, together with his conclusions and findings, both upon the evidence and the law of the cause. Pursuant to the order, the master thereupon proceeded to take the evidence, and, having completed the taking of it, to report it, together with his conclusions and findings both of law and of fact, to the court. Both parties thereupon filed exceptions to the findings of the master. After hearing the exceptions, the court entered a decree, in part sustaining and in part overruling the exceptions of the defendant, and overruling the exceptions of the plaintiff, and it is from this decree that each of the parties has appealed to this court. There is submitted, along with the submission on the merits, a motion filed by the appellee to dismiss the appeal, because the action being, as contended by it, one at law, the only remedy available to plaintiff to review the decree was by writ of error.

Baskin & Wilbourn, of Meridian, Miss., Bowers & Griffith, of Gulfport, Miss., and Callaway & Huie, of Arkadelphia, Ark., for appellant and cross-appellee.

J. I. Ford, of Pascagoula, Miss., W. A. White, of Gulfport, Miss., and Edwin T. Merrick, of New Orleans, La., for appellee and cross-appellant.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge (after stating the facts as above). The jurisdiction of a court of equity over the action is sought to be sustained upon two grounds:

(1) That the Mississippi statute (section 536 of the Code of Mississippi) confers on the chancery court of the state—

"jurisdiction of attachment suits based upon demands founded upon any indebtedness, whether the same be legal or equitable, or for the recovery of damages for the breach of any contract, express or implied, or arising ex delicto, against any nonresident, absent or absconding debtor, who has lands or tenements in this state."

The suit was brought in the state chancery court by attachment against the lands of the defendant under this statute, and removed by him to the Circuit Court of the United States. The contention of

the defendant is that the state statute could not confer on the Circuit Court of the United States jurisdiction in equity of a cause of action, in its nature legal, as distinguished from equitable. We find it unnecessary to decide this question, as the jurisdiction of the court over the appeal may be sustained upon the other ground upon which it is contended the case is one of equitable cognizance.

[1] (2) That an accounting is sought by the bill between the parties to it of mutual transactions covering a period of two years, involving numerous items of claim and counterclaim, the accounting being complicated in its nature, and one which it was impractical to arrive at fairly and adequately by the ordinary common-law proceedings. We are of the opinion that the following authorities tend to support the jurisdiction of the Circuit Court to entertain the cause upon its equity side, upon the ground of the necessity for an accounting: Fechteler v. Palm Bros. & Co., 133 Fed. 462–465, 66 C. C. A. 336; Fenno v. Primrose, 119 Fed. 801, 56 C. C. A. 313; Kirby v. R. R. Co., 120 U. S. 130, 7 Sup. Ct. 430, 30 L. Ed. 569; Beggs v. Edison Electric Co., 96 Ala. 295, 11 South. 381, 38 Am. St. Rep. 94; 1 Cyc. 420–424; 4 Pomeroy Eq. Jur. (3d Ed.) § 1420.

[2] If there is doubt as to whether the bill contains equity, for an accounting, if it had been assailed upon that ground in the court below, we are clearly of the opinion that it is sufficient in that respect, as against an attack first made upon it, upon that ground, in this court. The record shows that the defendant answered the original bill without objecting to the equitable jurisdiction of the court, also filed a cross-bill and consented to an order appointing a master, excepted to the master's report upon other grounds, and brought the record to this court by a cross-appeal, and first objected to the jurisdiction of the Circuit Court, as a court of equity, over the cause, after the cause had reached this court by appeal, and by a motion filed by him, in this court, to dismiss the appeal upon the ground that the cause was one of legal cognizance, and the final judgment in it would not sustain an appeal.

There was, at least, some ground for equitable jurisdiction, as for an accounting. It was not a case where the cause of action was indisputably a legal one. It was open for contention between the parties as to whether a sufficient case for an equitable accounting was presented. The defendant in the lower court made no contention against the equity of the bill, but consented to proceed with the cause upon the equity side of the court, and first objected to the exercise of the equity jurisdiction of the court below after appeal had been perfected from the decree of the lower court, and by a motion to dismiss the appeal, made in the appellate court. Having been tried as an equity case in the court below, and without objection by the appellee, and the cause of action being one embraced with one of the general heads of equity jurisdiction, the issue as to whether the pleadings and facts brought the case sufficiently within the jurisdiction of a court of equity will not be permitted to be made by the appellee, for the first time, in this court, but it will be treated in this court, as it was tried in the lower court, as an equity cause and properly

reviewable by the remedy of appeal. Highland Boy Gold Mining Co. v. Strickley, 116 Fed. 852, 54 C. C. A. 186-188; Hollins v. Brierfield Coal Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1115; Reynes v. Dumont, 130 U. S. 354, 9 Sup. Ct. 486, 32 L. Ed. 934; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 89; Burbank v. Bigelow, 154 U. S. 558, append., 14 Sup. Ct. 1163, 19 L. Ed. 51; Guaranty Co. v. Mechanics Co., 80 Fed. 772, 26 C. C. A. 146; Perego v. Dodge, 163 U. S. 160, 16 Sup. Ct. 971, 41 L. Ed. 113; Toledo Computing Scale Co. v. Computing Scale Co., 142 Fed. 919, 74 C. C. A. 92; 18 Encyc. Pl. & Practice, p. 119; Simpkins' Federal Equity Suit (2d Ed.) p. 25; 1 Cyc. p. 428.

The motion to dismiss the appeal is therefore dismissed. This renders it unnecessary for us to consider appellee's motion to dismiss a writ of error, which was subsequently sued out by appellant; the contention being that it was sued out after the expiration of the six months within which a writ of error lies to this court.

Coming to the merits, the purpose of the bill was to recover amounts alleged to be due under a contract entered into between the plaintiff and defendant, for an accounting to determine the amounts so due, and for the recovery for damages for its alleged breach. The cross-bill sought to recover certain items alleged to be due appellee under the contract, and for the recovery of damages for the alleged breach of the contract by appellant. At the time the contract was entered into, the plaintiff was the owner of about 12,000,000 feet of timber and a sawmill, which it was operating, cutting the timber which it owned. The defendant was the owner of about 80,000,000 feet of timber, adjoining plaintiff's, but had no mill. The then price of lumber was such as to make the manufacture of lumber attractive to both parties. In this situation the parties opened negotiations. The defendant was anxious to arrange for the cutting and sawing of his timber at the plaintiff's mill. This was agreeable to the plaintiff, provided the cutting and sawing of the defendant's timber was deferred until the plaintiff's timber had been first cut and sawed and marketed. Each party was desirous of getting the benefit of the present market prices for lumber, and naturally wished its or his lumber to be first disposed of. This obstacle to agreement was surmounted by the defendant's purchasing the plaintiff's timber on a stumpage basis, and the plaintiff agreeing to cut and saw the timber so purchased, as well as that originally owned by defendant, for a consideration to be paid it by defendant. On this basis the contract of March 26, 1906, that which is alleged to have been broken, was entered into. It provided for the logging, sawing, grading and placing on railroad cars of all merchantable pine timber, 10 inches and larger at the stump, that was then standing on lands owned by defendant in Harrison county, and which was indicated on a plat attached to the contract. The defendant agreed to pay the plaintiff $9 a thousand feet for the services to be rendered by it, to be paid between the 10th and 15th of each month for all lumber sawed the month previous, the amounts to be arrived at by the measurements of two tallymen, one furnished by each party, the final tally of all lumber sawed, and upon which final settlement

was to be made, was to be arrived at by the record of sales and shipments of the lumber sawed. The plaintiff was to receive $1 a thousand for all lumber so stacked as to require handling, the amount stacked never to exceed 500,000 feet. The plaintiff was to receive $9.50, instead of $9, a thousand for sawing if and when a circular saw was replaced by a band saw. All merchantable timber was to be cut from each tree. Defendant was to furnish saw bills and shipping instructions to keep plaintiff's mill and loading crews fully employed, but defendant was to have option of having the mill run or closed at nights. Plaintiff was to have the use of certain railroad material belonging to defendant, and to return the same at the end of the contract, or its value. Plaintiff was to keep the mill insured for not less than $20,000. If 25,000,000 feet or more remained uncut, at time of a fire, plaintiff was required to rebuild; if less than that amount, it had an option to do so. The defendant also agreed to buy from plaintiff the standing timber owned by plaintiff in Harrison county, as shown by a plat attached to the contract, and according to an estimate thereof by one M. Hemphill, a copy of which estimate it was recited was attached to the agreement, and to pay therefor at the rate of $4.50 per thousand feet, the payments to be made as follows, $10,000 when the plaintiff began operations, the balance as fast as the timber was cut, payments to be made on the 15th for all timber cut the previous month, but no further payments to be made until $10,000 worth of said timber was delivered at the contract rate per thousand. The plaintiff also agreed to change the dry kilns and install a machine shop, towards the cost of which the defendant was to contribute $5,000 if necessary for plaintiff's reimbursement. The plaintiff agreed to commence on the contract March 27, 1906, and to continue in a diligent manner until its completion. The plaintiff agreed to furnish the defendant with statement of the daily shipments. These are the provisions of the contract, so far as they have a material bearing upon the issues of the case.

The plaintiff duly entered upon the performance of the contract, commencing with timber, theretofore owned by it, and which was nearer to the mill, and the parties continued operations for some months before any dispute arose between them. The defendant paid the $10,000 in cash to plaintiff for the advance stumpage, and settlements were made, during the first few months, on account of saw bill and stumpage. The mill was changed by plaintiff from a circular to a band sawmill. The dry kilns were changed to steam and a machine shop was built, according to the terms of the contract. In May, 1907, the greater portion of the timber which had belonged to plaintiff was cut and sawed, and before the plaintiff ceased operations, the defendant's original timber was being cut and sawed. On February 22, 1908, a fire occurred which destroyed plaintiff's dry kiln, dry shed, and a large amount of lumber on its yard. In April, 1908, the plaintiff had rebuilt its mill and resumed operations, which continued until May 11, 1908, when the plaintiff shut the mill down and finally ceased operations under the contract.

Commencing with the fall of 1906, friction had arisen between the

plaintiff and defendant as to the proper construction of the contract, as to the amounts due plaintiff on monthly settlements both for saw bill and for stumpage, and after the fire in February, 1908, as to who should bear the loss for the lumber burned by it. These differences became acute, and other matters of difference arose also after the fire. It was contended by defendant that no estimate had been made by Hemphill of plaintiff's standing timber; that the contract provision that the plaintiff's timber should be paid for according to Hemphill's estimate had been abandoned, and payment for actual amount cut substituted by the parties therefor. The plaintiff contended that Hemphill had made the estimate, and that, though it was not attached to the contract, it should control. Defendant claimed that final settlement for amounts due on account of saw bill should be determined by record of shipments of lumber kept by defendant. The plaintiff claimed that the amount due on account of saw bill should be determined according to the course of business under the contract by "log scale" measurements at head of mill. The provision as to placing tallymen for each party at tail of mill was never carried out. There was a large discrepancy between the amount of lumber sawn as ascertained by log scale and by record of shipments. The defendant attributed this discrepancy to inaccuracy of log scale measurements. The plaintiff attributed it to defendant's acts in wasting the lumber after it had passed through the mill by cutting and trimming it in what the plaintiff claimed was an unauthorized way, to increase the grade, while diminishing the quantity. The defendant disclaimed responsibility for the lumber destroyed by fire. The plaintiff claimed that title passed to the lumber after it passed through the mill and was stacked, since it was then subject to defendant's orders as to removal and shipment, and that the loss should be borne by defendant. A dispute as to the amount of reimbursement plaintiff was entitled to on account of construction of machine shop and change in dry kiln also arose. Numerous fruitless endeavors to adjust differences occurred. At one time a settlement was supposed to have been accomplished, but it was differently construed by the parties, and unavailable. After the fire, the plaintiff again unsuccessfully attempted to get a mutual understanding as to the proper construction of the contract and an adjustment of differences, before reconstructing and resuming operations. After the mill had started up in April, 1908, differences again arose, and a final meeting was arranged between plaintiff's representatives and the defendant and his representatives, at Gulfport, but, like the others, it failed of reconciling the differences; the defendant denied that plaintiff had any valid contract, denied the Hemphill estimate, and was willing to proceed with the contract only upon his own construction of it, and to make future payments only upon the basis he had done in the past. The plaintiff thereupon in May, 1908, abandoned further operations under the contract, and brought this suit upon it. The differences mentioned are the material ones that the suit was intended to determine.

[3] Before the cause was at issue the parties agreed upon the appointment of a master by the court, and upon an order making the appointment, which was in this language:

"Order Approving Special Master.

"In the Circuit Court of the United States, Southern Division, Southern
District of Mississippi.

"Hattiesburg Lumber Company v. Fred Herrick.

"No. 83.

"In the above cause it is ordered by consent of the parties made known in
open court that the defendant have 30 days from this date in which to file
his answer and cross-bill, and that complainant have 60 days thereafter in
which to file answer to said cross-bill, each as of this term, and it is further
ordered and decreed, by consent of the parties as aforesaid, that C. G. Mayson,
Esq., be and he is hereby appointed a special master or commissioner of this
court in said cause, and that said commissioner be and he is hereby vested
with the power and authority to hear all testimony in said cause, to fix a place
or places for said hearing and to adjourn same from time to time, and to
suitable places to be determined by him, to require the attendance before him
of all witnesses with books, papers, and documents in their possession or un-
der their control, and to administer all oaths, to issue commissions for deposi-
tions of nonresident witnesses, and *to receive and consider all depositions
taken by either party*, and to examine all said witnesses and exhibits of docu-
ments, papers, and writings to the full extent that he, said commissioner, shall
deem lawful and proper, *and that he view all physical evidence offered by ei-
ther side, including a personal inspection of the premises involved in said
suit, if, in his discretion, same may be of benefit in determining any ques-
tion in said cause*, and that all the testimony of the witnesses be reduced to
writing, and that said commissioner report all same to this court at its next
regular term with all exhibits and all depositions of nonresidents offered, *to-
gether with his conclusions and findings, both upon the evidence and the law
of said cause.*

"Ordered, adjudged, and decreed this the 17th day of February, A. D. 1909.

"H. C. Niles, Judge.

"Filed February 17, 1909."

The master, after hearings, which consumed 11 weeks, made his
report to the court, stating his findings of facts and his conclusions
of law thereon. After his report was filed, each party filed excep-
tions to it, which are set out in the record. The court, after hearing
the exceptions, entered a decree, in which he partly sustained and
partly overruled the findings of the master, both upon questions of
fact and questions of law. This is the decree from which both par-
ties appeal.

The first question presented for our consideration is the weight
that is to be given the report of the master, as to his findings of fact,
and under the terms of the order, by which he was appointed. The
appointment of the master was by consent, and not alone by the ac-
tion of the trial court. So, by consent of the parties, his authority
was not restricted to the mere taking of the testimony and the sub-
mission of it, when taken, to the court. He was given, by consent of
the parties, the power not only to take evidence, but to hear all evi-
dence, taken in the case, by himself or by others, in the shape of dep-
ositions, to examine any physical evidence submitted by either party,
and to inspect the premises involved in the controversy, if he found
it of advantage to do so; and to report his findings of fact and con-
clusions of law to the court. It is clear that the authority so con-
ferred made of the master more than a mere commissioner to take
testimony. He was authorized to hear testimony taken by other com-

missioners, in the form of depositions, to examine physical evidence, and inspect the premises, evidence of a character that he could not transmit in his report to the court, and that the court could not benefit from. These powers would of themselves impliedly show that the parties submitted the cause to the master for his decision rather in the capacity of an arbitrator than that of a commissioner. However, the order expressly and by its terms requires him to report to the court, not only the testimony taken by him, but his findings of fact based thereon and his conclusions of law. Such powers could be conferred on the master only by consent of the parties, but they were so conferred. By consent of parties, it was competent for the court to abdicate partly its functions in favor of the master, as the order made by it shows it did, in this case. Under such an order, the findings of fact of the master, unless unsupported by any legal evidence or contrary to all the evidence before him, are conclusive and not open to contestation before the court. The master's conclusions of law, based on his findings of fact, are, when excepted to, reviewable before the court which appointed him. That this is the effect to be given the master's findings of fact, when appointed with such authority, is sustained by the authorities.

In the case of Kimberly v. Arms, 129 U. S. 512, 524, 525, 9 Sup. Ct. 355, 359, 360 (32 L. Ed. 764), the Supreme Court, distinguishing the authority of a master appointed in the ordinary way and one to whom, by consent of parties and an order of the court, the issues in a cause were referred, said:

"It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers. But when the parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, and report his findings, both of fact and of law, and such reference is entered as a rule of the court, the master is clothed with very different powers from those which he exercises upon ordinary references, without such consent; and his determinations are not subject to be set aside and disregarded at the mere discretion of the court. A reference, by consent of parties, of an entire case for the determination of all its issues, though not strictly a submission of the controversy to arbitration—a proceeding which is governed by special rules— is a submission of the controversy to a tribunal of the parties' own selection, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law. Its findings, like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise.

"The reference of a whole case to a master, as here, has become in late years a matter of more common occurrence than formerly, though it has always been within the power of a court of chancery, with the consent of parties, to order such a reference. * * * The power is incident to all courts of superior jurisdiction. * * *

"By statute in nearly every state, provision has been made for such references of controversies at law. And there is nothing in the nature of the proceeding, or in the organization of a court of equity, which should preclude a resort to it in controversies involving equitable considerations.

"By the consent in the case at bar it was intended that the master should

exercise power beyond that of a reporter of the testimony. If there had been such a limitation of his authority, there would have been no purpose in adding to his power 'to hear the evidence' the power 'to decide all the issues between the parties and make his report to the court, separately stating his findings of law and of fact,' together with the evidence. To disregard the findings and treat the report as a mere presentation of the testimony is to defeat, as we conceive, the purpose of the reference and disregard the express stipulation of the parties."

In the case of Davis v. Schwartz, 155 U. S. 637, 15 Sup. Ct. 239, 39 L. Ed. 289, the Supreme Court, reaffirming the case of Kimberly v. Arms, supra, said:

"The question of the conclusiveness of findings by a master in chancery under a similar order was directly passed upon in Kimberly v. Arms, 129. U. S. 512 [9 Sup. Ct. 355, 32 L. Ed. 764], in which a distinction is drawn between the findings of a master under the usual order to take and report testimony and his findings when the case is referred to him by consent of parties, as in this case. While it was held that the court could not, of its motion, or upon the request of one party, addicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers, yet where the parties select and agree upon a special tribunal for the settlement of their controversy, there is no reason why the decision of such tribunal, with respect to the facts, should be treated as of less weight than that of the court itself, where the parties expressly waive a jury, or the law declares that the appellate court shall act upon the finding of a subordinate court."

After restating the rule laid down in Kimberly v. Arms, the court proceeded:

"As the reference in this case was by consent to find the facts, we think the rule in Kimberly v. Arms applies; and, as there is nothing to show that the findings of fact were unsupported by the evidence, we think they must be treated as conclusive."

In the case of Farrar v. Bernheim, 75 Fed. 136, 139, 21 C. C. A. 264, 266, this court said:

"It is, moreover, true, as insisted by the appellee, that, under a certain consent to refer all questions of law and fact to the determination of the particular standing master, the finding of that officer is usually conclusive. Such a consent, entered as an order of court is a submission of the controversy to a special tribunal selected by the parties, to be governed by the ordinary rules applicable to the administration of justice in tribunals established by law; and its determinations are not subject to be set aside and disregarded at the mere discretion of the court."

In the case of U. S. Trust Co. v. Mercantile Trust Co. et al., 88 Fed. 140, 31 C. C. A. 427, the Circuit Court of Appeals for the Ninth Circuit, referring to the effect of the findings of such a master, said:

"Before entering into a consideration of these propositions, there is a preliminary question to be disposed of, and that is as to the effect to be given to the findings of fact of the special master. It is contended, at the outset, by the counsel for appellant, that this court and the court below are bound by the findings of fact made by the special master. It will be observed that the reference, by the court below, to the special master * * * was not that of an ordinary reference to take and report testimony, but it was stipulated and agreed between counsel representing all the parties that the special master should 'take the proofs of the respective parties, and report the same to the court, with his findings of fact and conclusions of law thereon.' The effect of this stipulation was undoubtedly to constitute, to a certain extent, the special master as judge of the facts presented to him. * * * So far, there-

fore, as the findings of fact by the special master, under the stipulations referred to, are based upon conflicting evidence, or upon the veracity of witnesses, or so far as there is evidence consistent with the finding they are conclusive and binding upon the court."

The authorities quoted from establish the principle that the findings of fact of a master, vested with the authority of the master in this case, are subject to review only when it is shown that they are not supported by any legal evidence, or are contrary to all the evidence submitted to him, in which cases the questions presented for review are questions of law and not questions of fact.

[4] In the instant case, each party excepted to the findings of the master, and it is contended that by so doing the whole matter was opened for review by the court. We find it unnecessary to decide whether in any case the filing of exceptions by a party might not reopen fully the master's report, as to him, for review by the court. Whether the filing of exceptions has such effect must depend upon the nature of the exceptions and the points intended to be presented by them. If they present for review the correctness of the master's report in matters of law only, the exceptor cannot be held to waive the conclusive effect of the master's findings of fact. The rule leaves open for review the master's conclusions of law, and exceptions intended to question such conclusions are consistent with rule, and so cannot constitute a waiver of it. Among the reviewable conclusions of law are included findings of fact based on no evidence, or contrary to all the evidence. Such findings are also open to exceptions upon that ground, and the filing of such exceptions would not be a waiver of the rule. The exceptions filed by plaintiff to the original report are two in number. The first excepts to the allowance of $143.50 to defendant for $41,000 feet of timber left in the woods in stumps over 14 inches high. Plaintiff asserts that there was no evidence submitted to the master to justify this finding. The exception, therefore, presents a question of law. The second exception relates to the disallowance by the master of plaintiff's claim for prospective profits, unrealized because of defendant's alleged breach of the contract. This also presents for review a question of law, since the master found that the contract had been breached, and disallowed prospective profits as damages only because of his holding that the breach was due to a misconstruction of the contract by defendant. The plaintiff's original exceptions would not estop him from invoking the rule, since their grounds were not inconsistent with it.

The plaintiff filed further exceptions to the original report and to the master's answers to certain interrogatories propounded by defendant, which involved matters of fact. These exceptions, however, were conditioned expressly by plaintiff upon a holding by the court that the findings of fact of the master could be reviewed. The plaintiff by failing to file exceptions in time would lose its right to have the master's findings reviewed, though the court held them to be subject to review. The defendant, having filed exceptions as to matters of fact, we do not think the plaintiff lost its right to insist upon the proper effect of the findings of fact, by taking the necessary steps to preserve its right to review them in the event the court differently construed the effect of

the order of appointment, when the exceptions were expressed to be effective only in the event the court so ruled.

This conclusion would require the findings of the master, which related to matters of fact, as distinguished from questions of law, to be sustained by the court unless there was an entire absence of evidence in support of them. The findings excepted to by the defendant, except those to which his tenth and sixteenth exceptions relate, relate to matters of fact, and, in our opinion, have the support of legal evidence, and the findings should have been sustained by the court below. (1) The master's finding upon which the defendant's tenth exception was based is to the effect that the title to the timber, under the contract, passed to the defendant when it was sawn into lumber and stacked upon the yard. (2) The master's finding upon which the defendant's sixteenth exception was based is to the effect that the plaintiff had the right to cease operations under the contract at the time it did, and that the cross-bill of the defendant should be dismissed.

[5] 1. The contract provided that the plaintiff should log, saw, and place, f. o. b. cars at Millview, Miss., in a good and workmanlike manner, certain merchantable timber owned or thereafter to be acquired by defendant, for which defendant was to pay plaintiff $9 a thousand feet, payments to be made monthly, according to the check of two tallymen, and final settlement to be made from records of sales and shipments. The plaintiff was to receive $1 per thousand additional for all lumber stacked upon the yard which required rehandling, the amount stacked at no time to exceed 500,000 feet. Defendant was to furnish saw bills and shipping instructions so as to keep plaintiff's mill and loading crew fully employed. Plaintiff was to cut timber in dimensions applicable to bills and schedules to be furnished it by defendant, and to fill all orders as quickly as possible. The contract was one for the performance of services, and not one for the sale of a commodity. The timber which was to be sawed into lumber was already the property of the defendant before it passed through the mill. The contract did not change the ownership of the timber, but only stipulated for certain services to be rendered with reference to it. The plaintiff was first to log and saw it, and then either to load it on the cars or stack it on the yard. The disposition of the lumber after it passed through the mill was to be determined by the defendant exclusively. If he furnished saw bills and shipping instructions, it was to be immediately loaded on cars by plaintiff. If no shipping instructions were furnished, it was to be stacked on the yard by the plaintiff, to await future disposition according to the orders of defendant.

[6] It seems clear, as the ownership of the timber remained always in the defendant, and the plaintiff's relation to it was confined to manufacturing it into lumber at defendant's instance for a reward, and either stacking or shipping the lumber, that the title, if it ever passed from defendant to plaintiff at any time, was certainly vested in the defendant after it had passed through the mill, and was either stacked on the yard or loaded on cars, as directed by defendant. After that its disposition and control was that of the defendant, and plaintiff, having completed the service required of it, should not be held responsible for its loss. This would be as true of the period the lumber re-

mained stacked on the yard awaiting defendant's directions to ship as it would be of the period subsequent to its being loaded on the cars for shipment. The contract provided that final settlement should be made by records of sales and shipments. This, however, did not have the effect of postponing the passage of title. Its purpose was merely to provide a method of correcting the temporary tally at the mill, a matter of convenience in accounting, which should not operate to change the time of the passing of title. Its effect to determine final amounts due was not such as to deprive the plaintiff of payment for sawing timber which the defendant thereafter wrongfully diminished in quantity by scaling and trimming, with the purpose of increasing its grade. We think the finding of the master in this respect was correct.

2. We are also of the opinion that the master correctly decided that the plaintiff was justified in ceasing operations under the contract in May, 1908, and that the defendant was entitled to no damages because thereof.

This results in a reversal of the cause upon the direct appeal, with directions to the court below to enter a decree confirming the report of the master, with the remittitur, and as amended by him, so far as its findings are affected by the exceptions of the defendant, and granting plaintiff the appropriate relief to which it is entitled under the master's report, and the affirmance of the decree so far as it is affected by the cross-appeal.

[7] There remain for decision the two questions raised by plaintiff's (appellant's) exceptions to the master's report originally filed. The plaintiff's subsequent exceptions were conditional upon the power of the court to review the master's report on questions of fact, and the denial by us of that power disposes of them adversely to plaintiff. Of the two original exceptions, the one which relates to the finding of an amount due from plaintiff to defendant of $143.50 for stumpage on 41,000 feet of defendant's timber left in the woods by plaintiff is not insisted on by plaintiff in this court, and is not passed upon by us for that reason. The other relates to the finding of the master that:

"As the differences between the parties in this case arose over the construction of the contract, and as each party manifested a willingness to carry it out according to his own interpretation, I do not find that either party has a right to claim of the other prospective profits."

This finding was excepted to by the plaintiff, and the court below overruled the exception, to which action the plaintiff assigns error in this court, which is insisted upon.

The ground upon which the court below overruled the plaintiff's exception to this finding of the master is thus expressed in the opinion of the district judge:

"The principle of law controlling the proposition under discussion as to complainant's right to recover for outlay and loss of profits is clearly stated in the case of United States v. Behan, 110 U. S. 338 [4 Sup. Ct. 81, 28 L. Ed. 168]: 'If a party injured by the stoppage of a contract elects to rescind the contract, he cannot either recover for outlay or loss of profits, but only for the value of services actually performed, as upon a quantum meruit.' It is a well-settled principle of the law that to justify one party to a contract in abandoning it, and at the same time entitle him to recover damages and the

future profits which he may have realized had he completely executed it, the opposite party must have been guilty of such a breach as to prevent or absolutely put an end to further operations under the contract by the party complainant."

We think neither the reason given by the master in his report, nor the different reason given by the District Judge in his opinion, are sufficient to justify the denial of damages to plaintiff, either for its outlay or for loss of future profits, if it has shown itself to be otherwise entitled to them.

Dealing, first, with the reason assigned by the master for his finding. The settled measure for recovery for a breach of contract is an amount which fully compensates a plaintiff for the loss sustained by the breach of contract, which includes the benefits and gain he would have realized from its performance, or, in the event they are too uncertain for assessment, then reimbursement for the expense of the outlay the plaintiff incurred in preparation for its performance. This is as much a part of the plaintiff's actual damages as is an amount due for a part of the contract performed before breach, and can no more be denied the plaintiff. Its recovery by plaintiff is a matter of right, and not of discretion with the court.

In the case of Robertson v. Cloud, 47 Miss. 208, the court said:

"The rule is that if complete performance of a contract is prevented by one party thereto, the other, who had complied, or was able and willing to comply, shall be compensated in damages to the extent of making him whole"

—which the court held to include "compensation for partial performance, according to the terms of the contract, and such damages as would legitimately result from the refusal of the plaintiff to permit a full performance."

In Trigg v. Clay, 88 Va. 335, 13 S. E. 435, 29 Am. St. Rep. 723, the court said:

"It has been held that, when the defendant refused to allow the contracts to be executed, the jury should allow the plaintiffs as much as the contract would have benefited them—profits or advantages which are the direct and immediate fruits of the contract, entered into between the parties, and part and parcel of the contract itself, entering into and constituting a portion of its very elements, something stipulated for, and the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. * * * An examination of the cases will show that the courts have been endeavoring to establish rules by the application of which a party will be compensated for the loss sustained by the breach of contract; in other words, for the benefits and gain he would have realized from its performance, and nothing more."

In Howard v. Stillwell Mfg. Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147, the Supreme Court said:

"But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the specific circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into"

The motive of the defendant in breaching the contract is not material upon the issue of the assessment of the plaintiff's actual damages. The plaintiff is entitled to his full actual damages for the breach, regardless of the motive that induced its breach. In the assessment of exemplary damages, in a case for such damages, the court or jury might properly look to the defendant's motives, as a matter of aggravation or mitigation. Punitive damages were not involved in this case. The master erred in denying the plaintiff any part of its actual damages, either by way of prospective profits or reimbursement for outlay in preparation, for the reason given by him, and which was that the defendant broke the contract because he misconstrued its proper meaning and was willing to perform according to his erroneous construction.

The reason given by the District Judge for denying the plaintiff damages by way of prospective profits or reimbursement for outlay was that the plaintiff had elected to rescind the contract after a breach by the defendant, which did not amount to a total abandonment of the contract on his part, and did not absolutely put an end to further operations under the contract by the plaintiff. The rule, as settled by the authorities, would seem to be that the prior breach upon defendant's part must have an effect that would render the plaintiff's subsequent performance of the contract difficult, and such as would greatly decrease the profits which the plaintiff would otherwise have made.

In the case of Anvil Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814, the Supreme Court said:

"It is insisted, and authorities are cited in support thereof, that a party cannot rescind a contract and at the same time recover damages for its nonperformance. But no such proposition is contained in that instruction. It only lays down the rule, and it lays that down correctly, which obtains when there is a breach of a contract. Whenever one party thereto is guilty of such a breach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken, and desist from any further effort on his part to perform; in other words, he may abandon it and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrongdoing of the other party has brought about. Generally speaking, it is true that when a contract is not performed the party who is guilty of the first breach is the one upon whom rests all the liability for the nonperformance. A party who engages to do work has a right to proceed free from any let or hindrance of the other party, and if such other party interferes, hinders, and prevents the doing of the work to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense. It may stop and sue for the damages which it has sustained by reason of the nonperformance which the other has caused."

In the case of Horst v. Roehm (C. C.) 84 Fed. 570, the court said:

"On behalf of the defendant it has been contended that, 'assuming that the action can be maintained, the measure of damages must be restricted to the loss, if any, upon the deliveries which should have been made prior to the bringing of the suit.' I cannot yield assent to this proposition. It conflicts with the principle that the measure of damages in every case must be such as, when applied, will result in ascertainment of the sum necessary to make good the entire loss sustained by reason of the act or default which constitutes the cause of action. The plaintiffs were, by the act of the defendant, prevented from making the deliveries called for by the contracts. It is this an-

ticipatory denial and obstruction of the right to deliver, not a tender and re-
fusal, which is the ground of the suit, and the measure which might other-
wise have been applicable is therefore wholly inappropriate. The law of
damages is not comprised in a set of arbitrary rules. Where a contract has
been broken or a wrong has been committed, compensation must be made.
This is the underlying principle, and any standard of measure which does not
accord with it cannot be applied, but some other, which is fairly compensatory
to the one party, and not unjust to the other, must be resorted to. Carroll-
Porter Boiler & Tank Co. v. Columbus Mach. Co., 5 C. C. A. 190, 55 Fed. 451.
In this case the plaintiffs have shown that they could have made subcontracts
for the delivery of the hops, according to their contracts with the defendant;
and, whatever might be the rule in a case in which this could not be shown,
I am of the opinion that where, as in this instance, that fact appears, the dif-
ference between the price at which such subcontracts could have been obtained
and the price named in the contracts between the parties is manifestly the
amount of the loss actually suffered, and therefore must be the correct meas-
ure of the damages recoverable. Hinckley v. Steel Co., 121 U. S. 264, 7 Sup.
Ct. 875 [30 L. Ed. 967]; 'Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct.
876 [38 L. Ed. 814]."

The case of Roehm v. Horst reached the Supreme Court of the
United States, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, and was
affirmed, and that court said, on page 20 of 178 U. S., page 780 of 20
Sup. Ct., on page 961 of 44 L. Ed., as follows:

"As to the question of damages, if the action is not premature, the rule is
applicable that plaintiff is entitled to compensation based, as far as possible,
on the ascertainment of what he would have suffered by the continued breach
of the other party down to the time of complete performance, less any abate-
ment by reason of circumstances of which he ought reasonably to have availed
himself. If a vendor is to manufacture goods, and during the process of man-
ufacture the contract is repudiated, he is not bound to complete the manu-
facture, and estimate his damages by the difference between the market price
and the contract price * * * and the cost of performance. Hinckley v.
Pittsburgh Bessemer Steel Co., 121 U. S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967.
Even if in such cases the manufacturer actually obtains his profits before the
time fixed for performance, and recovers on a basis of cost which might have
been increased or diminished by subsequent events, the party who broke the
contract before the time for complete performance cannot complain, for he
took the risk involved in such anticipation. If the vendor has to buy instead
of to manufacture, the same principle prevails, and he may show what was
the value of the contract by showing for what price he could have made sub-
contracts, just as the cost of manufacture in the case of a manufacturer may
be shown. Although he may receive his money earlier in this way, and may
gain, or lose, by the estimation of his damages in advance of the time for per-
formance, still, as we have seen, he has the right to accept the situation ten-
dered him, and the other party cannot complain.

"In this case the plaintiff showed at what prices they could have made sub-
contracts for forward deliveries according to the contracts in suit, and the dif-
ference between the prices fixed by the contracts sued on and those was cor-
rectly allowed."

The authorities cited show that it is sufficient to show that the plain-
tiff was so interfered with by defendant, or that defendant so far re-
pudiated the contract or breached its conditions, as that future per-
formance by plaintiff would have been substantially more difficult and
more expensive, so that its anticipated profits would have been ma-
terially lessened thereby.

The case of United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28
L. Ed. 168, is not in conflict with this rule and does not control this

212 F.—54

case. In that case the plaintiff was permitted to recover the amount of his outlay in preparing to perform the contract, but was not permitted to recover anticipated profits, and only because he had not proved them with sufficient certainty. The court distinguished the rule applicable to cases in which the plaintiff had elected to rescind the contract and to those in which he elected to go for damages for the breach of the defendant, as follows:

"When a party injured by the stoppage of a contract elects to rescind it, then, it is true, he cannot recover any damages for a breach of the contract, either for outlay or for loss of profits; he recovers the value of his services actually performed as upon a quantum meruit. * * * But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services. If he chooses to go further, and claims for the loss of anticipated profits, he may do so subject to the rules of law as to the character of profits which may be thus claimed."

In the instant case, as in the Behan Case, the plaintiff did not elect to rescind the contract, but was compelled to abandon its further performance by the conduct and breaches of the defendant, and is not thereby precluded from recovering anticipated profits, if they are ascertainable with reasonable certainty, or, if they are not, then at least the amount of the necessary outlay to enable it to perform the contract.

The master and the District Judge each found that the defendant first breached the contract, in a manner that entitled the plaintiff to refuse to proceed further with it, and yet recover all amounts due plaintiff up to the time of its refusal to proceed. We think the record shows that the breaches on defendant's part were such as to constitute legal prevention of performance by the plaintiff. The defendant, prior to cessation of operations by plaintiff, had repeatedly failed to pay monthly for all the lumber sawed the previous month; had failed to furnish saw bills and shipping instructions for the lumber sawed for a long period, so as to keep the plaintiff's loading crew unemployed; had permitted the lumber to accumulate on the yard largely in excess of the maximum stipulated in the contract; had refused to pay either stumpage or saw bill on lumber burned, though its presence on the yard was due to his negligent failure to give proper disposition; he wrongfully charged back to plaintiff a substantial part of the amount plaintiff had expended in changing the dry kilns and erecting a machine shop; he denied liability for unpaid stumpage, upon the ground that Hemphill had made no estimate of it, and had scaled down the lumber sawn by plaintiff for the purpose of increasing its grade, thereby wrongfully diminishing the amount due plaintiff on account of saw bill; he asserted that plaintiff had no valid contract of any kind with him, and in response to plaintiff's inquiry as to his future course, had notified plaintiff that he would proceed with the contract only upon the construction given it by him in the past, and which the master and the court below correctly determined to be an improper one. Under defendant's construction, the plaintiff could have proceeded to carry out the contract only with greatly diminished returns.

The plaintiff, just a month prior to the final cessation of operations, had reconstructed its mill, which had been partially burned. It had gone to great expense in preparation for the performance of the contract, and incurred an outlay which was of no substantial advantage to it for any other purpose. Its own timber had been very largely cut and sawn. It had a profit in sawing the defendant's timber, a reconstructed plant with which to do it, and which it could use for no other purpose. Its situation was such as to make it inconceivable that it should desire a termination of the contract.

On the other hand, the market price of lumber had fallen, and it was to defendant's interest that the mill should be shut down. He had made request of the plaintiff that it be shut down because of the condition of the market, had thrown obstacles in the way of plaintiff's operations, and evinced his reluctance to take the output of the mill.

In the final negotiations the plaintiff's representatives showed a disposition to adjust their differences with defendant, and to make concessions not required by the contract of it, and implored him to make concessions such as would make the continued operation of the mill possible. The defendant had the advantage of position in the trading, since the plaintiff, if the contract were abandoned, had an expensive, mill on its hands with its own timber substantially cut and sawn, and no timber other than defendant's adjoining it. The defendant's attitude was unreasonable and uncompromising, and can be reconciled only with the idea that he was anxious to compel the plaintiff to shut down the mill. The interest of the plaintiff to continue operations, and that of the defendant to have operations cease, bear out this view of the final negotiations.

Our opinion is that the plaintiff was prevented from performance by the conduct of the defendant, and was entitled to discontinue operations, without waiving its right to insist on compensation, not only for amounts then due under the contract, but as well for loss of future profits, if it could establish their amount with reasonable certainty, or, if not, then reimbursement for the amounts, if any, expended by it to perform the contract, and which were of no advantage to it for any other purpose.

The remaining question is whether the plaintiff should be allowed to recover anticipated profits under the facts of this case. The profit for manufacture, as it existed at the time of the shutting down of the mill, was determinable with reasonable certainty. The contract price was $9.50 a thousand feet, and the then cost to plaintiff of manufacture left it a substantial margin of profit. There remained uncut, at the time of the shutdown, about 80,000,000 feet of timber. About 16,000,000 had been cut by plaintiff from March 27, 1906, until May 11, 1908. Excluding the period during which the mill was not operated after the fire, from February, 1908, until April, 1908, and the total operations would cover a period of approximately two years, and the rate of the cutting approximately 8,000,000 feet annually. At this rate, 10 years would be required to cut all the timber covered by the contract. If the plaintiff's cost of cutting and sawing remained constant during that time, as was the case with the contract price of $9.50, the

profits could be assessed with reasonable certainty for the remaining period of the contract. It is not probable, however, that the cost of labor, fuel, feed, and supplies would continue constant over a period of 10 years, and this improbability introduces such an element of uncertainty into the assessment on the basis of future profits as to make it an unsafe measure of recovery.

We turn to the alternative method of assessment, that of reimbursement to plaintiff for its necessary outlay for preparation. The record clearly shows that it did certain things, in response to the stipulations of the contract itself, that were expensive to it, that it would not otherwise have done, and that were of no, or of but partial, advantage to it, apart from the fulfillment of the contract. We instance the change of the mill from circular to band saw construction, the change of the dry kilns, and construction of the machine shop, so far as there was an excess over the $5,000 agreed to be paid plaintiff by defendant for that construction, and the construction of railroad or logging tracks to reach the timber on defendant's property. It is a reasonable inference that the small amount of timber owned by plaintiff would not have justified it in expending the amounts, aside from its expectations from the performance of the contract. With the contract set aside, the plaintiff had on its hands a costly mill and equipment, with no available timber tributary to it. The tracks constructed on defendant's property were useless to plaintiff, except for the purpose of bringing defendant's timber to plaintiff's mill under the provisions of the contract.

It is clear that the plaintiff was put to a large expense for an outlay that had little value to it, in the absence of a performance of its contract with the defendant. The evidence shows that the amount of this outlay was in the neighborhood of $90,000. From that amount there should be deducted an amount which would represent the value of the use of the outlay during the time the contract was being performed by plaintiff, and the added value to plaintiff's mill and property, if any, due to the expenditure, and upon the hypothesis that it had no contract with the defendant. The present record probably furnishes data from which the correct result might be arrived at. In the court below no damages were allowed by the master or the court, either for future profits or reimbursement for outlay. In view of this determination of the court below, neither the parties, the master, nor the court probably had their attention sufficiently directed to the proper amount to be allowed on this account. We, therefore, think that it would be better not to attempt to fix the amount upon this record, but permit the parties to present their data again, after the proper legal measure of the recovery, on this account, has been fixed by this court.

The cause is remanded to the District Court, with directions to confirm the master's report upon the exceptions of both parties, except as to his finding that the plaintiff was entitled to no damages for loss of profits or expense of outlay, and to re-refer the cause to the master to permit the parties to present before him evidence only upon the question as to the amount of plaintiff's loss by reason of the preparation and outlay for the performance of that part of the contract which

it was disappointed of fulfilling by reason of the defendant's wrongful breaches, and, upon the coming in of the master's report, to award the plaintiff such relief as it may be shown thereby to be entitled to, in conformity with this opinion. The costs of appeal to be taxed against appellee.

SHELBY, Circuit Judge, dissents.

### On Application for Rehearing.

GRUBB, District Judge. This cause came on to be heard upon the application of both the appellant and the appellee for a rehearing, and was submitted on briefs by counsel; and, it appearing to the court that the evidence in the record tended to show that the appellant had collected the sum of $3,500 on account of fire insurance for the lumber destroyed by fire, and that the bill of complaint offered to credit said sum against any amount that might be found due to complainant from defendant, and it not appearing with certainty from the record whether the appellee was entitled to said credit or whether it had in fact been allowed said credit, on consideration of said applications, it is now here ordered and adjudged and decreed by this court that the decree of reversal heretofore rendered in this cause be and it is hereby modified, so as to direct that the case be re-referred to the master for the purpose, in addition to that named in the original decree, of ascertaining whether the appellee is entitled to a credit against the amount found due from him to the appellant for the said amount of insurance, and whether or not the said amount was in fact credited in the report of the master, and with said modification said decree of reversal is confirmed, and the applications for a rehearing of the said original decree are hereby denied.