**H. B. ZACHRY CO. v. TERRY.**

No. 13776.

United States Court of Appeals
Fifth Circuit.

March 22, 1952.

Rehearing Denied April 18, 1952.

Chester H. Johnson, San Antonio, Tex., Gordon Gibson, Laredo, Tex., for appellant.

George D. Byfield, G. C. Mann, Laredo, Tex., for appellee.

Before BORAH, RUSSELL, and RIVES, Circuit Judges.

BORAH, Circuit Judge.

This is an action brought by appellee, Tom N. Terry, against the appellant, H. B. Zachry Company, for an accounting under a written contract of employment.

The H. B. Zachry Company's principal business is general contracting but during the war it purchased and operated a large ranch, known as Rancho Blanco, of which the Buena Vista farms formed a part. On the farm there was a small village in which the company's farm and ranch laborers lived, also a lake reservoir which was used in the farm and cattle operations as well as by the company officers, employees and their friends for recreation. The ranch is located in a dry farming area but that portion of the land involved herein is subject to irrigation for growing vegetable crops, the irrigation equipment and pumps having been

on the premises at all times material to this suit.

Terry was first employed by the company as a farm manager in 1943 under an oral agreement whereby he was to receive a salary of $75.00 per week with the understanding that he would participate in bonuses if his services were satisfactory. In June, 1946, the following written contract of employment was entered into:

"You are to be employed by us to manage certain specific crops which we expect to grow at Rancho Blanco. The type of crops, location and acreage will be mutually agreed to prior to land preparation time. Your compensation will be $150.00 per month. To encourage efficiency, you will share in the net profit on your crops after harvest and sale. Your share of net profit is not to be paid in cash but will be allowed in the form of a credit to your account and will amount to 50% of such profit figured cumulatively on all your crops after June 1, 1946. Likewise, 50% of any net loss on such crops will be charged to your account. You will be allowed to draw not to exceed $1,000.00 in any three month period, chargeable to your account, so long as you have a credit balance with the Company. Any such credit you may have at termination of employment will be paid in cash, only after all crops planted under this deal are harvested and sold. In other words, if you should resign or be terminated while crops were in process, final settlement would have to await completion of these crops in order that their final results may be included.

"On June 15, 1946, you will be given a credit on our books of $......[1] (10% of net profit to be adjusted) as your bonus for the 1945–46 onion crop. Your credit will be adjusted upon the completion of each succeeding crop.

"The total cost of these crops will include all the applicable direct costs, including your monthly salary, plus $50.00 per acre for onions or $20.00 per acre for other crops, to cover rentals of land and on equipment now owned by the Company and assigned to your use. Any rental of equipment from outsiders, purchase of additional equipment or cost of replacement of existing equipment for your use is to be added to your crop costs.

"Under the arrangement outlined above, your status will be that of an employee of the H. B. Zachry Company and not as a sharecropper. The profit sharing feature of this deal is intended as a reward for over-all efficiency of management and not as wages. All transactions will be in the name of the Company and subject to the approval and instructions of the undersigned. You are to have no legal interest nor equity in any growing crop except such as the undersigned chooses to recognize.

"You will be held responsible to the undersigned for the crops assigned to you along with the necessary land, irrigation system, force and equipment therefor. For the ensuing twelve months you are assigned approximately 100 acres of carrots to be planted on any or all of that part of the farm West of the outlet ditch from No. 1 reservoir. Also, approximately 125 acres of onions to be planted upon what is known as the Buena Vista Field, East of the Lake. For these crops you are assigned the pumping plant at the No. 1 reservoir, the pumping plant on the East side of the Lake and the exclusive use of one Model B John Deere Tractor and all of the vegetable crop attachments therefor; the rain-machine system and the pump therefor; one pick-up truck and the cab-over-engine 1½ ton truck. In addition, you will be charged with the responsibility of the operation, care and maintenance of the RD-4 Caterpiller Tractor, the Model H John Deere Tractor, the Terracer, Bulldozer and Land Leveler, on the use of which pieces of equipment you will have the priority, but will make them available for other operations of the farm and ranch. Cross charges between you and the foremen of other operations on the farm for labor, etc., will not be permitted except as approved by both parties.

"Aside from the specific responsibilities delegated herein, your active constructive

---

1. This amount was later determined to be $3,824.08.

cooperation and interest in other farm and ranch operations will be expected."

For nearly three years the parties operated amicably under the contract and during that period nearly half a million dollars gross income was received by the company from the sale of farm produce grown under Terry's management. The books and records were kept by the company and after each crop was harvested and sold statements were rendered showing charges to the farming operation and credits due Terry. In the early part of 1949 Terry informed the company that he desired to terminate the contract when the onion crop then growing was harvested. In June of that year the company submitted to Terry a statement of his account, which he found to be unsatisfactory, and this suit followed.

After pre-trial conferences were held it was stipulated and agreed by and between the parties, conditioned upon a showing by Terry that he was entitled to an accounting from the company, that the account of the farming operations submitted by the company, as set forth in the margin,[2] was correct except as to the items or portions thereof or omissions therefrom stated therein [3] by Terry to be incorrect or omitted therefrom.

The case came on for trial before the court without a jury. Thereafter the trial judge made extensive findings of fact and conclusions of law and entered judgment in

2. The account submitted by the company in summary form is as follows:

ITEM
NO.

| | | | |
|---|---|---|---|
| 1) | Gross Income | | $481,526.19 |
| | Deductions: | | |
| 2) | Crop Costs | $311,728.40 | |
| 3) | Acreage Rental | 38,589.50 | |
| 4) | Rental of Equipment | 350.00 | |
| 5) | Purchased Equipment | 7,823.48 | |
| 6) | Replacement Cost of Equipment | 40,944.66 | |
| 7) | Dam & Reservoir Repair | 1,690.44 | |
| 8) | Depreciation—Bldgs. & Irrigation System | 7,841.19 | |
| 9) | Expense—Administration | 10,403.84 | |
| 10) | Bad Debts | 552.33 | 419,893.84 |
| 11) | Net Profits | | $ 61,632.35 |
| 12) | One-half Net Profits | | 30,816.17 |
| 13) | Plaintiff's Drawings | 35,063.62 | |
| 14) | Less: Plaintiff's Credits | 5,016.53 | 30,047.09 |
| 15) | Excess of one-half net profit Over Plaintiff's Drawings | | $ 769.08 |

3. To the above statement of account Terry filed exceptions and objections which may be summarized, in so far as here material, by Item Number as follows:

Item 1: Gross income $481,526.19. Terry claims that no milo maize crops were grown under the contract. Therefore, gross income should be reduced by $701 realized from milo maize sold and a $585 credit for grazing cattle thereon.

Item 2: Crop Costs $311,728.40. Terry contends that under the contract the following, totaling $10,574.83, are not proper charges against the farming operations: Insurance, taxes milo maize direct, milo maize indirect, repairs and maintenance, village repairs, water tower expense, village maintenance, raised ditches, maintain roads, clear land, repairs R. E., salary and wages—officers, new fence.

Item 3: Acreage rental $38,589.50. Plaintiff claims this is excessive by $8,000 for 400 acres of milo maize and $1,000 for fifty acres of carrots.

Item 5: Purchased Equipment $7,823.-48. Terry claims that equipment in the amount of $3,227.74 was not a proper charge under the contract and contends that one John Deere Tractor F-714 should be sold and the amount realized therefrom credited on the purchase of one John Deere Tractor F-837.

Item 6: Replacement Cost of Equipment $40,944.66. Terry admits that of this total amount $2,787.00 is a proper charge to the farming operations but contends that the remaining $38,157.66

favor of Terry in the amount of $52,864.49 [4] with interest thereon from April 25, 1951, and costs, plus one-half of the net amounts as and when collected on claims against railroads and one-half of the net proceeds from the sale of one Model B John Deere tractor. This appeal followed.

The appellant company's first point, that the cause of action asserted by Terry is an action at law and therefore the trial court erred in denying it the right to trial by jury, is without merit. In a civil action for an accounting the jurisdiction at law and in equity is concurrent. McNair v. Burt, 5 Cir., 68 F.2d 814, 815. In such cases, if demand for jury is made and the right is challenged, Professor Moore suggests that the court should determine whether the issues, even with the aid of a master, are too complex for jury trial and grant or deny a jury on that practical basis. 3 Moore's Federal Practice, § 38.02, p. 3012; see Williams v. Collier, D.C., 32 F.Supp. 321, 324, 48 Am.Bankr.Rep.,N.S., 799. This common sense approach finds support in Hattiesburg Lumber Company v. Herrick, 5 Cir., 212 F. 834, 837, wherein we said, " * * * an accounting is sought by the bill between the parties to it of mutual transactions covering a period of two years, involving numerous items of claim and counterclaim, the accounting being complicated in its nature, and one which it was impractical to arrive at fairly and adequately by the ordinary common-law proceedings. We are of the opinion that the following authorities tend to support the jurisdiction of the Circuit Court to entertain the cause upon its equity side, upon the ground of the necessity for an accounting: * * *.". Also to the same effect is Kirby v. Lakeshore & M. S. R. R. Co., 120 U.S. 130, 134, 7 S.Ct. 430, 432, 30 L.Ed. 569, wherein the Supreme Court declared: "The case made by the plaintiff is clearly one of which a court of equity may take cognizance. The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity. It would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion as to the amount of drawbacks to which Alexander & Co. were entitled on each settlement." Here, we also have a highly complicated series of mutual transactions covering a long period of time, involving numerous items of claim and counterclaim, which would have been extremely difficult and perhaps impossible for a jury to unravel. We are of the opinion that the company was under a duty to account and Terry had the right to go into equity to compel an accounting, which is a matter of settling accounts between the parties.

Appellant's second point requires a comprehensive examination of the trial court's interpretation of the various provisions of the contract. The court below found from the contract itself as well as from surrounding facts and circumstances that the rental of $20.00 per acre for "other crops" was only intended by the parties to

---

covers cost of replacing existing equipment, which is not chargeable under the contract to the farming operation.

Item 7: Dam and Reservoir Repairs $1,690.44.

Item 8: Depreciation Buildings and Irrigation System $7,841.19.

Item 9: Expense-Administration $10,403.84. Terry contends that Items 7, 8, and 9 are not chargeable to farming operations under the contract.

Item 10: Bad debts $552.23. This item is not in controversy as to the amount.

In addition to the above objections Terry affirmatively claims a credit of $3,824.08 as provided for in the second paragraph of the contract as set out above and that the accounting fails to give credit for inventory on hand at the close of operations in the amount of $5,904.89. Also, that he should be credited for collections on bad debts and railroad claims when, as and if made.

4. The amount of the judgment, without interest, is $47,921.93. Before computing interest $1449.75 was deducted therefrom, representing ½ of the net amount collected on bad debts and claims against railroads recovered leaving a total of $46,472.18. The interest on $46,472.18 at the rate of 6% per annum from July 17, 1949 to April 25, 1951, amounts to $4942.52, resulting in a judgment in the total amount of $52,864.49.

**190**

cover other vegetable crops; that the parties did not agree that the crop of milo maize should be a part of the farming operations and Terry's activities in connection with this crop were merely the result of a desire to actively co-operate with and assist in "other farm and ranch operations" as required by the contract. The court also found that for a long time after the milo maize crop was planted the company had no idea of charging rental on the land and that such charges were an afterthought on the part of the company, made after the dispute with Terry arose. Accordingly, the court held that all charges and credits pertaining to milo maize should be disallowed.[5] On this point, it is sufficient to say that we are convinced from our study of the record that the court did not err in its interpretation of the contract or in its challenged findings, which are fully supported by Terry's testimony and the company's admissions.

In disallowing a rental charge of $1,000 on 50 acres of carrots the District Court found that although the parties originally assigned 100 acres to the growing of carrots, the president of the company, Mr. Tiner, waived the $1,000 rental charge on 50 acres. Terry testified that at the time the carrot crop came on for harvest the market was unsettled and, since harvesting costs were then about equal to the market price, there was a risk of additional losses if the market should go lower; nonetheless, Terry was harvesting the carrots as rapidly as possible. About that time, Mr. Peguese, manager of the company's ranch operations, who was gathering up the culls, stated that because of the shortage of cattle feed he was very anxious to secure the carrots for that purpose. As a result, Terry told Mr. Tiner that if he felt the ranch operations needed the carrots or the farming operation would not benefit by harvesting them for market, he would be agreeable to permitting Peguese to harvest the balance of the crop. Tiner decided that the ranch should have the carrots and Peguese harvested and fed them to the company's cattle. Thereafter the company rendered a farm income and expense statement and instead of charging rental for a full 100 acres of carrots merely charged rental on 50 acres. When Terry acquiesced in this request, the ranch operation and the company benefited thereby and impliedly obligated itself to grant a credit to the farming operation, which it did, and the contention that there was no consideration for the waiver is without merit. Hence the District Court did not err in disallowing this charge.

Under Item 5 of the company's account a charge of $7,823.48 was made for "purchased equipment." Terry objected to this charge and claimed that four items of equipment[6] were not properly chargeable to farming operations. In disallowing these charges the court found that the Buda Power Unit was purchased prior to the date of the written contract and was used for pumping water from the river for cattle and farm crops; that the Gorman pump was never used in the farming operations; that the M-6326 Motor was used for the village water system; and that although the Farmall No. 2 was used for a short time in vegetable operations, it had been substituted for a Model D assigned to Terry but used by the company for other purposes. The contract specifically provides that the rental of $50.00 per acre for onions and $20.00 per acre for other crops covers rental, not only on the land but on equipment then owned by the company and assigned to Terry's use. It is true that the contract provided that any purchase of additional equipment was to be added to crop costs and that the Farmall No. 2 was equipment purchased after the contract had been entered into and it was used in vegetable operations. But the Farmall No. 2 was merely a substitute for equipment assigned to Terry, for which rental was charged, and

5. See footnote 3, supra, items 1, 2, and 3. The company credited gross farming income in the total amount of $1,286.00 as a result of sales of milo maize and grazing its cattle on the crop. Against this credit it charged $1,929.93 as direct costs, $247.37 as indirect costs, and $8,000 as acreage rental.

6. These four articles of equipment are: Buda Power Unit, $1600; Gorman Pump No. 2, $123; Farmall Model No. 2, $1384.04; M-6326 Motor $120.70.

the farming account should not also be charged for the substitute and the court rightly so held.

As to Terry's contention under Item 5 of his exceptions and objections,[7] that the farming account was entitled to credit for one Model B John Deere tractor, the court found that 'at the commencement of the farming operations under the contract the company assigned to Terry the Model B John Deere tractor and during the life of the contract Terry caused the company to purchase one Model BW John Deere tractor which was properly charged to farming operations. At the time, however, it was agreed that in order to reduce the amount which farming operations would be charged on the Model BW, the Model B should be sold and the proceeds therefrom applied to the cost price of the new tractor. Accordingly, Terry repaired the Model B for the purpose of sale but it was never sold because appellant's ranch manager borrowed it and used it for ranch purposes until the contract was terminated. Therefore, the court held that the farming account was entitled to a credit for one-half the value of the tractor which was agreed to be sold and directed the marshal to take and sell the tractor as under execution and after deducting all costs of the sale to pay one-half of the proceeds thereof to Terry and the other one-half to the company. The evidence fully supports the trial court's findings.

Item 6 of the statement of account submitted by the company,[8] contains a charge for "Replacement Cost of Equipment" in the amount of $40,944.66 of which $38,157.66 is in dispute.[9] This amount was arrived at by taking the value of the equipment at the beginning of operations under the contract and subtracting therefrom its appraised value at the termination of the contract. The question is whether that cost is chargeable under the terms of the contract as written. The contract provides that "Any rental of equipment from outsiders, purchase of additional equipment or cost of replacement of existing equipment for your use is to be added to your crop costs." There is nothing vague or ambiguous about this language. Clearly, it was intended to provide that in addition to the rental charged Terry for the use of equipment then owned by the company and assigned to his use, the crop costs were to be charged with additional costs in these three instances. First, in the event there was any rental of equipment from outsiders; second, if there were purchases of additional equipment; and third, the provision on which the company relies, the cost of replacement of existing equipment for Terry's use. Obviously if the articles purchased were to replace then existing equipment for Terry's use the articles must of necessity have been purchased during a time when Terry could use them, i. e., during the lifetime of the contract while Terry was conducting farm operations. The company does not claim that the charge sought to be imposed on farm operations represents equipment purchased during the lifetime of the contract as replacement for equipment assigned to Terry but would have us believe that the phrase, cost of replacement of existing equipment for Terry's use, refers to something in the nature of a depreciation charge. We are no more pursuaded by this argument than was the court below. In the first place, the contract does not so provide. Secondly, Terry was charged rental for the use of the machinery in question and it seems to us that it is extremely unlikely that in addition to the rental the parties also intended to charge a cost of depreciation. The trial court was right in disallowing $38,127.66 of the charge for "Replacement Cost of Equipment."

Items 7 and 8 of the company's account show charges of $1,690.44 for repairs to dam and reservoir, and a charge of $7,841.19 for depreciation on buildings. These permanent improvements were on the land at the inception of the contract and by its terms Terry was assigned "the necessary land, irrigation system, fence and equipment

---

7. See footnote 3, supra, Item 5.

8. See footnote 2, supra, Item 6.

9. Terry claims the true cost of replacement is $2,787.00, leaving a balance of $38,157.66.

therefor." Their agreement provided that the total cost of these crops would include all the applicable direct costs, including Terry's salary and a fixed rental on the land and equipment assigned to him. As a first ground of decision, the trial court was of the opinion that the contract was not ambiguous and on its face excluded these costs. The court reasoned, and we think rightly, that since the contract provides that the total crop costs would include all direct costs, including certain specifically enumerated costs and further provides for charging the cost of replacement of existing equipment for Terry's use, it thereby excluded indirect costs of this type. The court also found that charges in the total amount of $7,545.87 for property insurance, property taxes, repairs and maintenance—R.E., village repairs, water tower expense, village maintenance and salary and wages of officers, included in Item No. 2 of the account submitted by the company, were not applicable direct costs within the terms of the contract. We agree with the trial judge that the contract is not ambiguous and we are of opinion that the court's conclusions in relation to these items of indirect costs are fully supported by the terms of the contract. It seems to us entirely reasonable to say that such items as depreciation and repairs of permanent improvements are not items of direct cost within the meaning of the contract but were covered by the rental charge.

 Item 9 of appellant's account, a charge of $10,403.84 for administrative and general overhead expense of the company, involves a charge similar to those just considered. The court found that this charge was not made during the first two years of the contract but was conceived and charged as an afterthought after the dispute between the parties arose; that part of it was made up of a sudden bonus of $5,000 paid to the treasurer of the company, who jumped

from $5,000 or $6,000 to $11,000 after the dispute arose; and held that the specific incorporation of Terry's salary in the contract as one of the items of total costs to be included, excluded the charging of other salaries. The company concedes that this is an indirect cost in the sense that it had to be determined by allocation and admitted in response to a request for admissions that it did not charge such expense to the farming operation during the term of the contract but contends that this is a direct cost of the farming operations. We are of opinion that these costs were excluded by the terms of the contract but if it may be said, and we do not so hold, that the contract was ambiguous as to this item, it would follow that the practical construction placed upon it by the parties should control and, in either event, the court rightly disallowed this charge.

The court also found that the company charged off as bad debts $552.00 and Terry was entitled to one-half of the $420.00 thereof which had been collected at the time of trial; that Terry was entitled to one-half of $5,000.00, representing the value of expendable materials and supplies[10] on hand at the termination of the contract and thereafter used by the company; that Terry was entitled to one-half of the net amount collected on certain claims against railroads for overcharges on freight and other damages; and that defendant's account failed to give Terry credit for the sum of $3,824.08, the amount which the parties determined should be inserted in the blank space left in paragraph 2 of the contract as set forth above. These findings and conclusions are not seriously challenged and are without sufficient merit to warrant discussion.[11]

 Finally, appellant company claims that the trial court erred in allowing interest at the rate of 6% per annum on $46,-

10. These supplies were such as shipping sacks, fuel, tires, rodent poison. They were on hand at the termination of the contract and Terry offered to take them over for $5,000. This offer was refused by the company which used them for its own purposes.

11. The court also made various findings in favor of the company and against Terry but we do not deem it necessary to state them since the appellee does not here challenge the correctness thereof.

472.18 [12] from July 17, 1949, to the date of judgment. Article 5070, Vernon's Annotated Civil Statutes, provides that "When no specified rate of interest is agreed upon by the parties, interest at the rate of six per cent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable * * *." The appellant company contends that the statute is not applicable because the amount due was not liquidated. The controlling authorities are however to the contrary. Wichita Petroleum Co. v. Winant, 5 Cir., 295 F. 67; Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185; also see Federal Life Ins. Co. v. Kriton, 112 Tex. 532, 249 S.W. 193. These decisions are dispositive of the question presented and fully support the trial court's allowance of interest.

Appellee Terry's request for damages under Rule 30 of this court, on the ground that the company sued out this appeal merely for delay without any reasonable belief in its right to prevail, is denied.

The judgment appealed from is affirmed.

---

12. This amount does not include one-half of the amount collected on bad debts nor one-half of the claims against railroads.