229 F.2d 892
 William VESS and Elsa F. Von Seggern, jointly and severally,
as individuals and as partners in Fred Astaire
Dance Studios, Appellants,
v.
FRED ASTAIRE DANCE STUDIOS CORPORATION, Appellee.
 No. 15728.
 United States Court of Appeals Fifth Circuit.
 Feb. 13, 1956.
 
 Robert Lee Guthrie, Johnson, Guthrie & Stanfield, Frank Norton, Dallas, Tex., for appellants.
 Wm. Madden Hill, Ungerman, Hill, Ungerman & Angrist, Dallas, Tex., for appellee.
 Before HUTCHESON, Chief Judge, and BORAH and BROWN, Circuit Judges.
 BROWN, Circuit Judge.
 
 
 1
 The principal question, in this diversity action, is whether Vess (and his partner) as Licensee of Astaire under a five-year exclusive 'License and Franchise Agreement' was required to pay, as a weekly minimum guarantee, $75.00 under the original contract[1] and $50.00 under the settlement modification,[2] or whether, as Vess claims, the franchise fee was determinable solely by the stated percentage (12 1/2% at first, 10% later) of the gross income with the weekly fixed payment being in the nature of an advance against which credit or refunds would be owing Vess in any week in which the amount fixed by the percentage was less, and to which would be added such further amounts to equal the percentage figure where the gross would produce more than the fixed sum.
 
 
 2
 As a part of Licensee's argument, it is urged that the contract was ambiguous and a practical construction[3] adopting Licensee's theory was put upon it by the parties, Navajo Production Corp. v. Panhandle Eastern Pipe Line Co., 5 Cir., 132 F.2d 1, 3.
 
 
 3
 The District Court, rejecting this and Vess's basic contention, held it to be, in substance, a minimum weekly guarantee. We agree.
 
 
 4
 Language more apt, terms more precise to lawyers and judges, not dancers, might well have been employed. But in totality, the contract seems plainly to reflect an intention that for the use of its valuable name and the incidental additional services to be supplied, the Licensor was to have a fixed, positive compensation. The contract itself speaks in terms, the 'payments * * * shall constitute a guarantee * * *', and the mechanics for weekly remittances calling for the transmittal of '* * * the payment of the guarantee * * *' gives emphasis to its nature as a minimum by coupling with it, 'and such moneys over and above such guarantee as are due for such week * * *.'
 
 
 5
 Moreover, while the contract is precise in requiring Licensee to maintain adequate records open for inspection and submit periodic profit and loss statements on which to audit percentages payable for gross income, or the like, no provision is even remotely suggested for audit to determine overpayments by, or refunds due, Licensee.
 
 
 6
 For all of the period involved here, these conclusions are strengthened by the Settlement Agreement language that, 'Payments of $50.00 per week averaged over the course of a year' should constitute the guarantee. As this was but a way of stating that to the extent the total percentage payments (10%) should not equal $2,600.00, a payment of $50.00 per week would be due, it may be that the amendment benefited the Licensee by permitting him to offset the excess of the fat weeks against the lean. But this helps none here since, as we hold, the judgment is to be based on the minimum only for all periods save one, and as to it the evidence supports a gross on which the total, based on percentage, exceeds the amount due on the weekly minimum. And, in any case, the very purpose of averaging was to assure a minimum compensation.
 
 
 7
 The amounts due on either theory required the consideration of detailed records, books and memorandums maintained by Licensee, the reconstruction of useable substitutes for the long period in which he purposely failed to forward reports, and a calculation, day-by-day, week-by-week, month-by-month, over a four-year period as to the actual business done. As such it was a proper case for the equitable accounting sought and obtained, and it was not error to deny the requested jury trial. Fitzpatrick v. Sun Life Assurance Co., D.C.N.J., 1 F.R.D., 713; cf. H. B. Zachry Co. v. Terry, 5 Cir., 195 F.2d 185, certiorari denied 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637.
 
 
 8
 Appellants also make a contention that the contract is void entirely as a price-fixing arrangement in violation of the Texas Anti-trust Laws, Vernon's Texas Civil Statutes, Arts. 7426, 7428. A contract unrelated to any article of merchandise, produce, or commodity, such as this one, depending, for its business value, primarily on the good will and wide public acceptance of the Fred Astaire name in the field of dancing, and whose only restrictive quality is an asserted scale of minimum rates not shown either to have been an actual part of the contract, or ever promulgated, or enforced, is without the scope and intent of the Texas Statutes. Shaddock v. Grapette Co., Tex.Civ.App., 259 S.W.2d 231; 29 Texas Jurisprudence, Monopolies and Combinations, § 18; Cf. State v. Fairbanks-Morse Co., Tex.Civ.App., 246 S.W.2d 647, 654, Error Refused, N.R.E.; Duggan Abstract Co. v. Moore, Tex.Civ.App., 139 S.W.2d 198, Error Dismissed, Judgment Correct.
 
 
 9
 The District Court followed the correct principles, although in the actual accounting some errors, which we correct, were made due, we think, to the confusing and poorly organized form of the accounting evidence. We modify the decree to provide recovery[4] of $6,325.00 instead of $7,117.34 as adjudged. The principal difference is in deleting recovery for any items prior to December 6, 1952, since, for substantial consideration, the settlement contract accepted $2,500.00 'in full settlement of the * * * total outstanding indebtedness as of the week ending December 6, 1952' (footnote 2, supra); and a reduction for the period December 27, 1952 to December 12, 1953, since the testimony most favorable to appellee would not support a gross in excess of $27,017.40. The case being tried and judgment entered June 8, 1955, it was entirely proper for the court to allow the minimum guarantee through the end of the contract period, September 30, 1955. Vess had repudiated the contract in November 1954, operated the studio under his own name (still listed in the telephone directory as Fred Astaire Studio), and had attempted to turn his own pretended assignment of the contract into a cancellation. In this setting it was utterly reasonable to require payment of the minimum contract revenues for this three and one-half-month period without putting the Licensor to a separate suit or proof of specific damage.
 
 
 10
 Modified, and as modified, affirmed, costs to be divided.
 
 
 
 [1]
 The License and Franchise Agreement of 28 paragraphs provided:
 '2. Consideration:
 'Licensee agrees to make
 '(a) * * *
 '(b) Payments of $75.00 weekly, which shall constitute a guarantee against the following percentages: (Set guarantee is waived for a period of four weeks from the opening of the studio. During those weeks the studio is expected to remit only payments as designated below).
 '(1) Licensee agrees to pay 12-1/2% per cent of the weekly total 'gross receipts' of the Licensee * * * and to account therefore by delivery of a statement of the total gross receipts along with the payment of the guarantee and such moneys over and above such guarantee as are due for such week on the Tuesday following that week; and in addition thereto.'
 
 
 [2]
 Commencing operations October 2, 1950, Vess remitted but.$535.96 on claimed royalties of $7,522.79 and being over $500.00 in arrears on additional reimbursable items, a settlement was made by which, in consideration of Vess procuring an additional $10,000.00 capital through his new partner, Miss Von Seggern, Astaire Studio on December 6, 1952 agreed:
 '(2) To accept the sum of $2,500.00 in cash, receipt of which is hereby acknowledged, in full settlement of the said $7,531.80 total outstanding indebtedness as of week ending December 6th, 1952 by Licensee to Fred Astaire Dance Studios Corporation;
 '(3) To modify Paragraph 2(b) of the said License and Franchise Agreement to read as follows:
 "Payments of $50.00 per week averaged over the course of a year, which shall constitute a guarantee against the following percentages:'
 '(4) To modify Paragraphs 2(b)(1) in regard to royalty payment of 12-1/2%: -- It is agreed that 2-1/2% is to be retained by Licensees for supervision and management, and 10% is to be remitted to Fred Astaire Dance Studios Corporation.
 'All other terms and conditions set forth in the said License and Franchise Agreement shall remain in full force and effect.'
 
 
 [3]
 These were: (a) the printed weekly report forms furnished by Licensor had no space for 'weekly minimum guarantee'; (b) no complaint was made when remittances for poor weeks were less than minimum (contradicted by appellee's witness on the stand); (c) in calculating royalties due up to October 31, 1952, the Letter Agreement of December 6, 1952 (see Footnote 2, supra) showed that the amount of royalties in arrears ($7,522.79) was calculated on percentage rather than $75.00 minimum which would have produced $7,725.00; and (d) Vess's books and income tax returns never reflected this as a liability
 
 
 [4]
 
 Dec. 6, 1952 to Dec. 31, 1952 3 1/2 wks. @ min. $50.00 $ 175.00
Jan. 1, 1953 to Dec. 12, 1953 10% Gross 2,701.74
Dec. 12, 1953 to Dec. 31, 1953 2 1/2 wks. @ min. $50.00 125.00
Jan. 1, 1954 to Jan. 1, 1955 52 wks. @ min. $50.00 2,600.00
Jan. 1, 1955 to Sept. 30, 1955 39 wks. @ min. $50.00 1,950.00
 ---------
 $7,551.74
 Less Payments made 1,226.74
 ---------
 Total due (plus interest from June 8, 1955) $6,325.00